# NEW YORK LIFE INSURANCE COMPANY *v.* CRAVENS.

### ERROR TO THE SUPREME COURT OF THE STATE OF MISSOURI.

No. 262.   Argued April 25, 1900.—Decided May 28, 1900.

The contract for life insurance in this case, made by a New York insurance company in the State of Missouri, with a citizen of that State, is subject to the laws of that State regulating life insurance policies, although the policy declares " that the entire contract contained in the said policy and in this application, taken together, shall be construed and interpreted as a whole and in each of its parts and obligations, according to the laws of the State of New York, the place of the contract being expressly agreed to be the principal office of the said company in the city of New York."

The power of a State over foreign corporations is not less than the power of a State over domestic corporations.

The business of insurance is not commerce, and the making of a contract of insurance is a mere incident of commercial intercourse in which there is no difference whatever between insurance against fire, insurance against the perils of the sea, or insurance of life.

THE controversy in this case is as to the amount due upon a policy of insurance issued by the plaintiff in error, upon the life of John K. Cravens, husband of the defendant in error.

The contention of the plaintiff in error is that there is only due on the policy, if anything, the sum of $2670; that of defendant in error is that she is entitled to the full amount of the policy, to wit, $10,000, less unpaid premiums.

These contentions depend chiefly for solution on the statute of Missouri, inserted in the margin,[1] Missouri Rev. Stat. 1879,

---

[1] SEC. 5983. Policies non-forfeitable, when.—No policies of insurance on life hereafter issued by any life insurance company authorized to do business in this State, on and after the first day of August, A.D. 1879, shall, after payment upon it of two full annual premiums, be forfeited or become void by reason of the non-payment of premiums thereon, but it shall be subject to the following rules of commutation, to wit: The net value of the policy when the premium becomes due and is not paid shall be computed upon the American experience table of mortality, with four and one half per cent interest per annum, and after deducting from three fourths of

c. 119, Art. 2, and the issue arising is, whether the defendant in error, as beneficiary in the policy because of the payment of

---

such net value any notes or other indebtedness to the company, given on account of past premium payments on said policy issued to the insured, which indebtedness shall then be cancelled, the balance shall be taken as a net single premium for temporary insurance for the full amount written in the policy, and the term for which such temporary insurance shall be in force shall be determined by the age of the person whose life is insured at the time of default of premium, and the assumption of mortality and interest aforesaid; but if the policy shall be an endowment, payable at a certain time, or at death if it should occur previously, then if what remains as aforesaid shall exceed the net single premium of temporary insurance for the remainder of the endowment term for the full amount of the policy, such excess shall be considered as a net single premium, for a pure endowment of so much as such premium will purchase, determined by the age of the insured at date of defaulting the payment of premium on the original policy, and the table of mortality and interest as aforesaid, which amount shall be paid at the end of the original term of endowment, if the insured shall then be alive.

SEC. 5984. A paid-up policy may be demanded, when.—At any time after the payment of two or more full annual premiums, and not later than sixty days from the beginning of the extended insurance provided in the preceding section, the legal holder of the policy may demand of the company, and the company shall issue its paid-up policy, which, in case of an ordinary life policy, shall be for such an amount as the net value of the original policy at the age and date of lapse, computed according to the American experience table of mortality, with interest at the rate of four and a half per cent per annum, without deduction of indebtedness on account of said policy, will purchase, applied as a single premium upon the table rates of the company, and in case of a limited payment life policy, or of a continued payment endowment policy payable at a certain time, or of a limited payment endowment policy, payable at a certain time, or at death, it shall be for an amount bearing such proportion to the amount of the original policy as the number of complete annual premiums actually paid shall bear to the number of such premiums stipulated to be paid: Provided, that from such amount the company shall have the right to deduct the net reversionary value of all indebtedness to the company on account of such policy: and provided further, that the policy holder shall, at the time of making demand for such paid-up policy, surrender the original policy, legally discharged, at the parent office of the company.

SEC. 5985. Rule of payment on commuted policy.—If the death of the insured occur within the term of temporary insurance covered by the value of the policy as determined in section 5983, and if no condition of the insurance other than the payment of premiums shall have been violated by the insured, the company shall be bound to pay the amount of the policy,

four annual premiums, and notwithstanding the omission to pay the fifth and sixth annual premiums, is entitled to extended insurance as provided in section 5983, that is, to the full amount of the policy less unpaid premiums, or is entitled to the amount of commuted insurance tendered by plaintiff in error.

The case was submitted upon an agreed statement of facts substantially as follows :

That the defendant is a corporation organized and existing under the laws of the State of New York as a mutual life insurance company, without capital stock, having its chief office in the city of New York, and was, at the date of issuing the policy in question and since has been engaged in the business of insuring lives through branch offices in the different States and Territories of this country and certain foreign countries; and that it maintains agents and examiners in the State of Missouri.

On May 2, 1887, the local agent of the company solicited John K. Cravens, at his residence in Missouri, to insure his life in the

---

the same as if there had been no default in payment of premiums, anything in the policy to the contrary notwithstanding: Provided, however, that notice of the claim and proof of the death shall be submitted to the company in the same manner as provided by the terms of the policy, within ninety days after the decease of the insured; and, provided, also, that the company shall have the right to deduct from the amount insured in the policy the amount compounded at six per cent interest per annum of all the premiums that had been forborne at the time of the decease, including the whole of the year's premiums in which the death occurs, but such premiums shall in no case exceed the ordinary life premium for the age at issue, with interest as last aforesaid.

SEC. 5986. *The foregoing provisions not applicable, when.*—The three preceding sections shall not be applicable in the following cases, to wit: If the policy shall contain a provision for an *unconditional cash* surrender value at least equal to the net single premium for the temporary insurance provided hereinbefore, or for the unconditional commutation of the policy to non-forfeitable paid-up insurance for which the net value shall be equal to that provided for in section 5984, or if the legal holder of the policy shall, within sixty days after default of premium, surrender the policy and accept from the company another form of policy, or if the policy shall be surrendered to the company for a consideration adequate in the judgment of the legal holder thereof, then, and in any of the foregoing cases, this act shall not be applicable.

company, and thereupon Cravens signed and delivered to the local agent a written application for the policy in suit. The application was made a part of the policy, and contained the following provisions:

"That inasmuch as only the officers of the home office of the said company in the city of New York have authority to determine whether or not a policy shall issue on any application, and as they act on the written statements and representations referred to, no statements, representations, promises or information made or given by or to the person soliciting or taking this application for a policy, or by or to any other person, shall be binding on said company, or in any manner affect its rights, unless such statements, representations, promises or information be reduced to writing and presented to the officers of said company, at the home office, in this application.  . . .

"That the contract contained in such policy and in this application shall be construed according to the laws of the State of New York, the place of said contract being agreed to be the home office of said company in the city of New York."

The application was signed by the agent of the company and forwarded to the latter's home office in New York, and thereupon the policy in suit was issued and transmitted to Kansas City by the company to its agent, who there received the same, and there delivered it to Cravens on the 20th of May, 1887, and collected the first premium provided to be paid.

Four annual premiums of $589.50 each were paid in Missouri. The fifth and sixth premiums were not paid. Cravens died November 2, 1892, in Missouri, and proof thereof was duly made.

The company had different forms of policies, and Cravens selected a non-forfeiting limited tontine policy, fifteen years' endowment, with the limited premium return plan of insurance. This plan is described in the policy as follows:

"This policy is issued on the non-forfeiting limited tontine policy plan, the particulars of which are as follows:

"That the tontine dividend period for this policy shall be completed on the 11th day of May, in the year nineteen hundred and two.

"That no dividend shall be allowed or paid upon this policy

unless the person whose life is hereby insured shall survive until completion of its tontine dividend period, and unless this policy shall then be in force.

"That surplus or profits derived from such policies on the non-forfeiting limited tontine policy plan as shall not be in force at the date of the .completion of their respective tontine dividend periods, shall be apportioned among such policies as shall complete their tontine dividend periods."

At the end of the tontine period certain. benefits were to be allowed, which are stated in the policy, but which need not be repeated.

The policy also contained the following provision:

"That if the premiums are not paid, as hereinafter provided, on or before the days when due, then this policy shall become void, and all payments previously made shall be forfeited to the company, except that if this policy, after being in force three full years, shall lapse or become forfeited for the nonpayment of any premium, a paid-up policy will be issued on demand within six months after such lapse, with the surrender of this policy, under the same conditions as this policy, except as to payments of premiums, but without participation in profits, for an amount equal to as many fifteenth parts of the sum above insured as there shall have been complete annual premiums paid hereon when said default in the payment of premium shall be made; and all right, claim or interest arising, under statute or otherwise, to or in any other paid-up policy or surrender value, and to or in any temporary insurance, whether required or provided for by the statute of any State, or not, is hereby expressly waived and relinquished."

The total number of policies, of the plan of the policy in suit, issued in the year 1887 to the residents of all states and countries where the company was doing business was 5172, covering an aggregate of insurance of $20,154,981.

The amount of paid-up insurance to which the policy was entitled, at the date of lapsing, was $2670. No demand was made for it within six months after default, or at any time. Upon the death of Cravens the company offered to waive the failure to make such demand, and tendered defendant in error,

and still tenders her, the amount of such paid-up policy, which she declined, and still declines.

On the 11th of May, 1891, Cravens was fifty-three years old, "and the term of temporary insurance procured at that date by three fourths of the net value of the policy, taken as a single premium for the amount written in the policy, was six years and forty-six days from the 11th day of May, 1891, making said policy, if subject to said extended insurance, in force at the death of the said Cravens."

The defendant in error claims under the policy $10,000, less the amount of unpaid premiums, with interest thereon, which left a balance of $8749.21, with interest at six per cent from November 30, 1892. The plaintiff in error admitted and offered to pay the sum of $2670, which plaintiff in error declined to receive.

The trial court rendered a judgment for the plaintiff (defendant in error) for the sum of $2670.

On appeal to the Supreme Court of the State the judgment was reversed, and the case was remanded with directions to enter judgment for plaintiff (defendant in error) for the sum of $8749.21, with interest at six per cent from November 30, 1892.

The case was then brought here.

It is urged as error against the judgment of the Supreme Court of the State that it makes the law of Missouri and not the law of New York the law of the contract, as provided in the application for the policy, thereby denying to the plaintiff in error a contractual liberty without due process of law, in violation of the Fourteenth Amendment of the Constitution of the United States; and that the statute of Missouri is an attempted regulation of interstate commerce.

*Mr. Frederick N. Judson* for plaintiff in error. *Mr. George W. Hubbell* was on his brief.

*Mr. William B. C. Brown* for defendant in error. *Mr. J. V. C. Carnes* and *Mr. James H. Cravens* were on his brief.

MR. JUSTICE MCKENNA after stating the case, delivered the opinion of the court.

The plaintiff in error presents its contentions in many forms, but they are all reducible to one, to wit, that the statute of Missouri has been decided to supersede the terms of the policy, and to be the rule and measure of the rights and obligations of the parties, notwithstanding the application for the policy declares "that the entire contract contained in the said policy and in this application, taken together, shall be construed and interpreted as a whole and in each of its parts and obligations, according to the laws of the State of New York, the place of the contract being expressly agreed to be the principal office of the said company, in the city of New York."

What, then, is the meaning of the Missouri statute, or, rather, what meaning did the Supreme Court declare it to have?

It declared that the statute did not have the meaning the trial court decided it to have. In other words, it declared that the policy did not come within the exception of the statute providing for paid-up insurance, in lieu of temporary insurance, which was one of the contentions of the plaintiff in error, and on account of which it had tendered the sum of $2670, and sustaining which the trial court rendered its judgment.

With this part of the opinion, however, we have no concern. Our review is only invoked of that part of the opinion which decides that the Missouri statute is the law of the policy, and which annuls the provisions of the policy which contravene the statute. And even of this part our inquiry is limited. If we are bound by the interpretation of the statute we need not review the reasoning by which that interpretation was reached. And we think we are bound by it.

The court said, though more by inference than by direct expression, that the statute was a condition upon the right of insurance companies to do business in the State.

This conclusion it fortified by the citation of cases, and said (148 Mo. 583):

" Foreign insurance companies which do business in this State do so, not by right, but by grace, and must in so doing con-

form to its laws; they cannot avail themselves of its benefits without bearing its burdens. Moreover, the State may prescribe conditions upon which it will permit foreign insurance companies to transact business within its borders or exclude them altogether, and in so doing violates no contractual rights of the company. *State* v. *Stone*, 118 Mo. 388; *Daggs* v. *Ins. Co.*, 136 Mo. 382; *S. C.* 172 U. S. 557."

And further:

"As the non-forfeiture clause in section 5983 does not come within the exceptions specified in section 5986, it would seem that the provision in the policy with respect to its forfeiture or lapse after being in force three full years, by the non-payment of premiums, is void and of no effect, and that such statutory provision cannot be waived.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"It is well settled that the legislature of the State has the power to pass laws regulating and prescribing rules by which foreign insurance companies may do business in this State, and to prohibit them from doing so altogether if inclined. *Paul* v. *Virginia*, 8 Wall. 168; *State* v. *Stone*, *supra*; *Hooper* v. *California*, 155 U. S. 648; *Daggs* v. *Insurance Co.*, *supra*. This case has recently been affirmed by the Supreme Court of the United States.

"It logically follows that in passing the sections of the statute quoted the legislature did not exceed the powers conferred upon it by the state constitution, and that such legislation is not in conflict with any provision of the Constitution of the United States."

From the Missouri law as thus established, may the plaintiff in error claim exemption by virtue of the Constitution of the United States?

What the powers of a corporation are in relation to the State of its creation—what the powers of a corporation are in relation to a state where it is permitted to do business, was declared early in the existence of this court, and has been repeated many times since. What those powers are we took occasion to repeat in *Waters-Pierce Oil Co.* v. *The State of Texas*, decided at the present term. 177 U. S. 28.

The case arose from a liberty of contract asserted by the Waters-Pierce Oil Company against certain statutes of the State of Texas prohibiting contracts in restraint of competition in trade. The statute was not only assailed because it took away the liberty of contract, but because it discriminated between persons and classes of persons. The latter ground we declined to consider, because it did not arise on the record. Of the former we said:

"The plaintiff in error is a foreign corporation, and what right of contracting has it in the State of Texas? This is the only inquiry, and it cannot find an answer in the rights of natural persons. It can only find an answer in the rights of corporations and the power of the State over them. What those rights are and what that power is has often been declared by this court.

" A corporation is the creature of the law, and none of its powers are original. . They are precisely what the incorporating act has made them, and can only be exerted in the manner which that act authorizes. In other words, the State prescribes the purposes of a corporation and the means of executing those purposes. Purposes and means are within the State's control. This is true as to domestic corporations. It has even a broader application to foreign corporations."

And as the state court had held that the statute was a condition imposed upon the oil company doing business within the State, we said of the statute that, "whatever its limitations were upon the power of contracting, whatever its discriminations were, they became conditions of the permit and were accepted with it."

We stated the exceptions of the rule to be "only cases where a corporation created by one State rests its right to enter another and engage in business therein upon the Federal nature of its business."

Is the plaintiff in error within the exception? If not, the pending controversy must be determined against it.

It is difficult to give counsels' contentions briefly and at the same time clearly, nor are we sure that we can distinguish by precise statement the arguments directed to the invalidity of

the statute of Missouri as an unconstitutional interference with the contractual liberty of the plaintiff in error, from the arguments which assail the statute as an attempted regulation of commerce between the States. This, however, not on account of any want of clearness in counsel's argument, but on account of the many ways which they have presented and illustrated the argument, and which cannot be noticed in detail without making this opinion too long. We realize the propositions are not the same and should not be confused, though made somewhat dependent upon a common reasoning.

1. A policy of mutual life insurance, it is contended, is an interstate contract, and the parties may choose its "applicatory law." Instances under the law of usury, instances under private international law, are cited as examples and authority. But if such cases apply at all, they necessarily have limitation in the policy of the State. This is not denied, but it is contended that contracting for New York law to the exclusion of Missouri law was "in nowise prejudicial to the interests of the State of Missouri or violative of its public policy."

But the interests of the State must be deemed to be expressed in its laws. The public policy of the State must be deemed to be authoritatively declared by its courts. Their evidence we cannot oppose by speculations or views of our own. Nor can such interests and policy be changed by the contract of parties. Against them no intention will be inferred or be permitted to be enforced.

In passing on the statute in controversy we said, by Mr. Justice Gray, in *Equitable Life Assurance Society* v. *Clements*, 140 U. S. 226:

"The manifest object of this statute, as of many statutes regulating the forms of policies of insurance on lives or against fires, is to prevent insurance companies from inserting in their policies conditions of forfeiture or restriction, except so far as the statute permits. The statute is not directory only, or subject to be set aside by the company with the consent of the assured; but it is mandatory and controls the nature and terms of the contract into which the company may induce the assured to enter. This clearly appears from the unequivocal words of command

and of prohibition above quoted, by which, in sec. 5983, 'no policy of insurance' issued by any life insurance company authorized to do business in this state 'shall, after the payment of two full annual premiums, be forfeited or become void by reason of the non-payment of premium thereon; but it shall be subject to the following rules of commutation;' and in sec. 5985, that if the assured dies within the term of temporary insurance, as determined in the former section, 'the company shall be bound to pay the amount of the policy,' 'anything in the policy to the contrary notwithstanding.'"

And after stating the cases in which the terms of the policy are permitted to differ from the plan of the statute, it was further said:

"It follows that the insertion, in the policy, of a provision for a different rule of commutation from that prescribed by the statute, in case of default of payment of premium after three premiums have been paid; as well as the insertion, in the application, of a clause by which the beneficiary purports to 'waive and relinquish all right or claim to any other surrender value than that so provided, whether required by a statute of any State or not;' is an ineffectual attempt to evade and nullify the clear words of the statute."

In *Orient Insurance Company* v. *Daggs*, 172 U. S. 557, the insurance company contended it had the constitutional right to limit by contract its liability to actual damages caused by fire against the provision of the statute which made, in case of total loss, the amount for which the property was insured the measure of damages. We sustained the statute independently of the ground that it was a condition of the permission of the company to do business in the State. We sustained it on the ground of the clear right of the State to pass it, and to accomplish its purpose by limiting the right of the insurer and insured to contract in opposition to its provisions.

Further comment on this head may not be necessary, and we only continue the discussion in deference to the insistence of counsel upon the interstate character of the policy in suit. It is the basis of every division of their argument, and an immunity from control is based upon it for plaintiff in error, which, it

seems to be conceded, the State can exert over corporations of its own creation.

An interstate character is claimed for the policy, as we under- stand the argument, because plaintiff in error is a New York corporation and the insured was a citizen of Missouri, and be- cause, further, the plaintiff in error did business in other States and countries. Does not the argument prove too much? Does it depend upon the residence of plaintiff in error in New York? If so, it would seem that every contract between citizens of dif- ferent States becomes at once an interstate contract, and may be removed from the control of the laws of the State at the choice of parties. If the argument does not depend on the residence of the plaintiff in error, but on the other elements, a Missouri insurance corporation can have the same relation to them as plaintiff in error, and can be, as much as plaintiff in error claims to be, " the administrator of a fund collected from the policy holders in different States and countries for their benefit"—the condition which plaintiff in error claims demon- strates the necessity of a uniform law to be stipulated by the parties exempt from the interference or the prohibition of the State where the insurance company is doing business. And yet plaintiff in error seems to concede that such power of stipula- tion Missouri corporations do not have, while it, a foreign cor- poration and because it is a foreign corporation, does have.

After stating the necessity of a uniform law and an equal necessity that parties may stipulate for it, counsel for plaintiff in error say :

" It necessarily follows, therefore, that the insurance policy contracts of foreign insurance companies, as contracts of other foreign corporations, made by them with the citizens of a State, when doing business in that State through the comity of the State, are like the contracts of natural persons, subject to the limitations of their own charters, and the situs of such contracts is to be determined by the fundamental rules of ' universal law.'

" As will be hereafter seen, this status as foreign corporations does not mean that they were not subject to the laws of the State enacted in the full plenitude of the police power of the State. The State doubtless could limit their contractual power by prohibiting the making of certain contracts. But unless the

foreign corporation is reincorporated as a domestic corporation, it remains a foreign corporation, and its contracts with citizens of the State are interstate contracts, subject to the right of choice of law thereof, which is inherent in the law of interstate contracts."

A foreign corporation undoubtedly is not a domestic corporation, and the distinction must often be observed, but the deduction from it by plaintiff in error cannot be maintained.

The power of a State over foreign corporations is not less than the power of a State over domestic corporations. No case declares otherwise. We said in *Orient Ins. Co.* v. *Daggs, supra:*

"That which a State may do with corporations of its own creation it may do with foreign corporations admitted into the State. This seems to be denied, if not generally, at least as to plaintiff in error. The denial is extreme and cannot be maintained. The power of a State to impose conditions upon foreign corporations is certainly as extensive as the power over domestic corporations, and is fully explained in *Hooper* v. *California,* 155 U. S. 648, and need not be repeated."

2. Is the statute an attempted regulation of commerce between the States? In other words, is mutual life insurance commerce between the States?

That the business of fire insurance is not interstate commerce is decided in *Paul* v. *Virginia,* 8 Wall. 168; *Liverpool Ins. Co.* v. *Mass.,* 10 Wall. 566; *Phila. Fire Asso.* v. *New York,* 119 U. S. 110. That the business of marine insurance is not is decided in *Hooper* v. *California,* 155 U. S. 648. In the latter case it is said that the contention that it is "involves an erroneous conception of what constitutes interstate commerce."

We omit the reasoning by which that is demonstrated, and will only repeat, "The business of insurance is not commerce. The contract of insurance is not an instrumentality of commerce. The making of such a contract is a mere incident of commercial intercourse, and in this respect there is no difference whatever between insurance against fire and insurance against the 'perils of the sea.'" And we add, or against the uncertainty of man's mortality.

*Judgment affirmed.*