BLACKWELL v. SOUTHERN PAC. CO.

(Circuit Court, N. D. California. December 19, 1910.)

No. 14,820.

**1.** CARRIERS (§ 149½*)—CARRIAGE OF GOODS—LIMITED LIABILITY CONTRACT—VALIDITY.

Where a shipper was given an option of different rates, one based on full legal liability by the carrier for actual value of goods lost or damaged, and the other a lower rate for which the carrier proposed to carry the goods in case it was released and liability limited to a valuation agreed on between the parties and noted on the bills of lading, and the shipper voluntarily and with full knowledge accepted the lower rate and agreed on a valuation much less than the actual value of the goods, and that the carrier should not be liable except for gross negligence beyond the agreed value, such contract was valid and not contrary to public policy.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 651–662; Dec. Dig. § 149½.*]

**2.** COURTS (§ 359*)—FEDERAL COURTS—RULES AND DECISIONS.

Where Congress has not seen fit to legislate on a subject involving no federal question, and the case presenting such subject is in the federal court merely by reason of diversity of citizenship of the parties, the court will determine the question in accordance with the declared policy of the state in which it sits, as found either in its statutes or the decisions of its highest tribunal.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 359.*

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

At Law. Action by William Blackwell against the Southern Pacific Company. Judgment for plaintiff.

Thomas, Gerstle, Frick & Beedy, for plaintiff.
C. W. Durbrow, for defendant.

VAN FLEET, District Judge. This is an action at law to recover from the defendant, as a common carrier, damages resulting from the failure of the carrier to deliver in good order and condition certain consignments of spirits and whisky shipped over its lines; the amount claimed being based upon the full or market value of the goods lost.

The consignments all moved under tariff schedules, regularly promulgated and filed by the carrier providing alternative rates, whereby the shipper was given the option of shipping at a certain specified rate of carriage, with full legal liability by the carrier for the actual value of the goods lost or damaged; or of shipping at a specified lower rate, with liability of the carrier released and limited to a valuation agreed upon between the parties and noted on the bills of lading; and during the period covered by the shipments in question there existed between the shipper and carrier special contracts of carriage covering the commodity, whereby, in consideration of the shipper being given the benefit of the lesser rate, the carrier was released from liability other than for gross negligence, beyond the valuation so agreed upon, and which was in each instance stated and indorsed by

the shipper on his bill of lading in such appropriate manner as to bring it within the terms of the contract existing at the time of the particular shipment.

No claim of gross negligence is made, the loss arising from leakage or other cause flowing merely from the ordinary accidents of carriage; nor does the case present any question growing out of coercion or overreaching by the carrier, the shipper, so far as appears, being afforded perfect freedom of election between the alternative rates offered and making his choice of the lesser with a full appreciation of its purpose and effect, and the contracts apparently being entered into by both parties freely and voluntarily, for their mutual benefit.

The evidence, however, is such as to indicate, if material, that, in making the contracts, the value of the goods was, with the knowledge of both parties, fixed without reference to their real value, but at a figure much less; and this fact has given rise to the only question in the case, the contention of the plaintiff being that, because with the carrier's knowledge such agreed value failed to equal or approximate the actual value, the case discloses an attempt to unlawfully limit the liability of the carrier, and that the contracts are therefore void as against public policy, and plaintiff entitled to recover his actual loss.

In this attitude plaintiff does not deny the right in the carrier to limit his common-law liability as such by special contract, so long as he does not attempt to exempt himself from responsibility for his own wrong or negligence; nor is it denied that he may lawfully stipulate, in consideration of accepting a lower rate of carriage, for a corresponding limitation of the extent of his liability in the event of loss, the contract being fairly made; but it is claimed that, where it appears that the agreed value is so disproportionate to the actual as to show that the latter was wholly ignored, the contract must as matter of law, and no matter how free in fact from bad faith, be regarded as unfair and wanting in bona fides, and as having only the purpose of avoiding the legal liability of the carrier.

While some such limitation in the right of special carriage contracts has been recognized in certain of the states, the doctrine has never obtained in this state, nor does it accord with the principles announced on the subject by the Supreme Court of the United States. The facts do not make a case distinguishable in principle from that of Hart v. Penna. R. R. Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717, which is conceded to be the leading case upon the subject in this country. If anything, the facts here presented are not as favorable to the claim made as they were in that case. There the plaintiff had shipped over the lines of the carrier a chartered car of five horses under a bill of lading designated, "Limited Liability Live Stock Contract," issued by the defendant company to the plaintiff and signed by him, wherein, in consideration of the rate of carriage therein stated, the liability of the defendant carrier was limited in case of loss to a valuation of $1,200 for the contents of the car, with certain other limitations and conditions not material to notice. It did not appear, as in the case at bar, that the plaintiff was, under the schedule of rates, expressly given a choice of paying a higher rate of carriage with full legal liability by

the company in preference to the contract signed by him; but, so far as the record indicates, the bill of lading tendered was the regular and only form prepared and used by the defendant for the shipment of such property with all of its stipulations printed therein, and was signed by the plaintiff as presented without his being asked to state the real value of the property. Loss having occurred, the plaintiff sued to recover a sum largely in excess of the valuation stipulated in the bill of lading, as damages alleged to have been sustained through the defendant's negligence, and at the trial offered to prove that the horses were valuable race horses; that one of them, killed by the defendant, was actually worth $15,000; and that two others injured so as to be worthless were of a value of $3,000 to $3,500 each. The Circuit Court excluded this evidence and held that plaintiff was limited in his recovery to the agreed valuation of $1,200 stipulated in his bill of lading. The case went to the Supreme Court, where it was claimed, as here, that the contract was void as against public policy in attempting to fix a limit of liability by the carrier less than the actual loss suffered. The judgment was affirmed, the court holding that the contract was valid and obligatory and not opposed to public policy; that:

"Where a contract of carriage, signed by the shipper, is fairly made with a railroad company, agreeing on a valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations." (Syllabus.)

This statement of the doctrine declared is fully borne out in the text, and is put upon the ground that, the rate of carriage being graduated in accordance with the valuation agreed upon, there is a just and reasonable consideration moving to both shipper and carrier; and that it would be inequitable, in the absence of fraud or imposition by the latter, to permit the former to avoid his contract. In this respect it is said:

"This qualification of the liability of the carrier is reasonable, and is as important as the rule which it qualifies. There is no justice in allowing the shipper to be paid a large value for an article which he had induced the carrier to take at a low rate of freight on the assertion and agreement that its value is a less sum than that claimed after a loss. It is just to hold the shipper to his agreement, fairly made, as to value, even where the loss or injury has occurred through the negligence of the carrier. The effect of the agreement is to cheapen the freight and secure the carriage, if there is no loss; and the effect of disregarding the agreement, after a loss, is to expose the carrier to a greater risk than the parties intended he should assume. The agreement as to value, in this case, stands as if the carrier had asked the value of the horses, and had been told by the plaintiff the sum inserted in the contract."

And in answer to the argument that to uphold such a contract is to relieve the carrier from liability, and thus withdraw the incentive to care and diligence on his part, it is further said:

"The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond

in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practiced on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss."

The principles of that case have been fully recognized and followed by the Supreme Court of this state in Donlon Bros. v. Southern Pacific Co., 151 Cal. 763, 91 Pac. 603, 11 L. R. A. 811, a case presenting facts precisely similar in legal effect to those there considered. In the Donlon Case the bill of lading fixed the value of the animals killed at $20 each, and the plaintiffs sought to recover an alleged value of $1,500 upon substantially the same contention as urged here, and further that the contract was obnoxious to the provisions of section 2175 of the Civil Code of the state, providing that a common carrier cannot exonerate himself from liability for his gross negligence by any agreement made in anticipation thereof. It was held that the contract did not contravene the statute and was not opposed to any principle of public policy, but that, having been fairly made, it concluded and limited the rights of both parties. After a careful review of the authorities on the subject, it is there said:

"In two cases in this court, while the particular section of our Code as to contracts limiting liability for gross negligence was not directly involved, still, discussing the effect of an agreed valuation in a contract between a shipper and carrier, the court expressed itself in approval of the rule laid down in the Hart Case. Said this court: 'There is a wide distinction between a contract for exemption from liability in case of negligence which is usually held in derogation of public policy tending to encourage negligence, and a contract fairly made whereby, in consideration of a lower freightage, the parties agree upon a fixed or determinate value to be placed upon the article to be shipped, in case of its loss.' Pierce v. Southern Pacific Co., 120 Cal. 156, 166, 47 Pac. 874, 52 Pac. 302 [40 L. R. A. 350].

"Also: 'It would be unreasonable for a shipper to expect his packages to be carried for a compensation based upon an agreed valuation much less than the actual value and then, in case of loss, recover the full value. * * * Where * * * the shipper agrees to a certain value, he should not be heard in case of loss to claim a greater value. Such a contract is fair and reasonable and is not contrary to public policy. It is not a contract that relieves the carrier from responsibility for his own misbehavior; he is liable in case of loss for the value of the packages as agreed to by the shipper, and upon which value he pays a reduced compensation for the carriage. Limitation as to value does not excuse negligence.' Michalitschke v. Wells Fargo & Co., 118 Cal. 683, 688, 50 Pac. 847. * * *

"It is true that there are some authorities holding to a contrary doctrine, as there are those which sustain contracts exempting carriers from all liability for negligence; but the weight of American authority is in support of the doctrine announced in the Hart and other cases cited."

And speaking of the specific feature of the contract here relied upon as rendering it void, it is said:

"Nor, in determining whether such a contract is fair or reasonable, can there be taken into consideration the fact whether the agreed value of the property reasonably approximated its real value. That question was pre-

sented in some of the cases cited. In Hill v. Northern Pacific Ry. Co., 33 Wash. 697, 74 Pac. 1054, in reply to a contention of counsel for appellant urging that it should, the court said: 'An examination of the cases cited we do not think sustains this contention, and, even where there has been an attempt to make this distinction, it has been in principle a failure. The contract establishing the released valuation must be construed to embrace the real valuation.' In the Hart Case, 112 U. S. 331, 337, 5 Sup. Ct. 151, 28 L. Ed. 717, which was a suit relative to the value, as here, of race horses, the court dismisses that contention as without merit, saying: 'Although the horses, being race horses, may aside from the bill of lading have been of greater value than that specified in it, whatever passed between the parties before the bill of lading was signed was merged in the valuation it fixed."

The attempt to distinguish those cases from the one at bar is unsuccessful. As we have seen, the rate in this case was made to depend upon the value of the commodity, that value being agreed upon for the purpose of securing the advantage of the lower rate, and in that respect this case is squarely with the doctrine as there stated.

The fact that the goods were in fact of greater value than that agreed upon is immaterial, and was so decided in the Donlon Case; and the fact that both the carrier and shipper knew that the actual value was greater than that stipulated is likewise immaterial, and was so considered in the Hart Case. The evidence here, as in those cases, fails to show that the contracts were not fairly made. While it is true that such a contract will not be enforced if unfair, that only means that the agreement must not have been procured from the shipper by the deceit or coercive action of the carrier; and, as we have seen, there is nothing of that nature appearing in the case.

In support of the distinction contended for, plaintiff places his main reliance upon a report of the Interstate Commerce Commission in 13 I. C. R. 550, under the title, In the Matter of Released Rates. In that opinion the learned commissioner writing the report was expressing the views of the commission as the result of an ex parte hearing, upon the general subject of the validity of released rates, so-called, or contracts for limited liability of the carrier, and particularly as affected by section 20 of the Hepburn act. After discussing the question in various other phases and reaching the conclusion that the right of contract remains substantially unaffected by that section, it is said, in speaking of contracts undertaking, like the present, to limit the liability of the carrier to a stipulated or agreed value:

"(c) If the specified amount does not purport to be an agreed valuation, but represents an attempt on the part of the carrier to limit the amount of recovery to a fixed sum, irrespective of the actual value, the stipulation is void as against loss due to the carrier's negligence or other misconduct.

"Much confusion has arisen from failure to distinguish between this situation and the situation comprehended in Hart v. Pennsylvania Railroad Co., supra. That decision was expressly predicated upon the principle of estoppel; the shipper had misrepresented the value of his property, and had thereby secured the benefit of a lower rate than he was properly entitled to by virtue of the real value. He was estopped by his fraudulent conduct from recovering an amount in excess of the value he had declared. In the case we are now considering, the requisites of estoppel are wanting. An estoppel cannot arise unless the party invoking it has been the victim of misrepresentation and has himself acted in good faith. Can it possibly be argued that when a carrier has arbitrarily placed in its bill of lading a stipulation limiting the amount of its liability, regardless of the actual value of the property,

it may claim the benefit of an estoppel? Obviously not: it has not acted in good faith, neither has it been the victim of misrepresentation."

And again:

"(d) If the specified amount, while purporting to be an agreed valuation, is in fact purely fictitious and represents an attempt to limit the carrier's liability to an arbitrary amount, liability for the full value cannot be escaped in event of loss due to negligence.

"This situation is substantially identical with that just considered—the difference is one in form only. If the shipper and carrier collusively agreed that, for the purpose of the transportation, the property shall be deemed to have a specified value which both knew to be grossly disproportionate to the true value, the agreement cannot be called bona fide. It may be styled an 'agreed valuation,' but it is obviously an attempt to accomplish what the law forbids. This requirement that the carrier shall not limit in any degree its responsibility for negligence is uncompromising, and it will not yield merely because the parties choose to employ the phrase 'agreed valuation.' The law will not countenance so obvious a subterfuge."

It is contended that, within the rule as thus stated, and more especially as stated in the second proposition (d), the contracts involved should be held void as entered into collusively and in bad faith, since both parties knew of the disparity between the actual and the stipulated value of the goods shipped; and it may be conceded that, if the proposition as there put embodies a correct statement of the law, that result should follow. But it is at once apparent that the views there advanced are based upon the authority of certain state decisions where such doctrine prevails and the theory that the decision is the Hart Case is not opposed thereto. In other words, the opinion construes the latter case as having no application to an instance where both parties to such a contract are aware that they are stipulating to a value greatly disproportionate to the actual value of the property. This is plain since it is said in effect that the carrier in that case did not know the value of the property to be other than as stated in the bill of lading; and it is explicitly stated that the decision was "expressly predicated upon the principle of estoppel" because of the fraudulent misrepresentation of the value by the shipper.

A careful reading of the opinion in that case will disclose that this statement involves an obviously erroneous conception of the ground on which the conclusion of the Supreme Court was rested. While the court discusses, with other elements, the effect of misrepresentation or concealment as to value in making such a contract, it does not base its decision upon the existence of any such element in that case. Indeed, upon the facts as stated, no such element was there shown. The court bases its conclusion squarely upon the proposition that the shipper was concluded by his contract; the court saying:

"Although the horses, being race horses, may, aside from the bill of lading, have been of greater value than that specified in it, whatever passed between the parties before the bill of lading was signed was merged in the valuation it fixed."

And again:

"The valuation named was the 'agreed valuation,' the one on which the minds of the parties met, however it came to be fixed."

And the court concludes:

"The distinct ground of our decision in the case at bar is that where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations. Squire v. New York Central R. R. Co., 98 Mass. 239, 245 [93 Am. Dec. 162], and cases there cited."

From this it is certain that, as stated above, the question of the carrier's knowledge of the real value of the goods, where the contract is otherwise fair, is regarded by the Supreme Court as a wholly immaterial factor. The views of the Interstate Commerce Commission as above expressed are therefore out of harmony with the principles announced by the Supreme Court in that case.

But independently of the decision in that case this court would feel called upon to follow the ruling of the Supreme Court of the state in the Donlon Case. Congress has not seen fit to legislate on the subject of the validity of contracts of the nature involved; and consequently, the matter for decision involving no federal question, the case being here merely by reason of diversity of citizenship, this court will adopt the declared policy of the state in which it sits, as found either in its statutes or the decisions of its highest tribunal. Pennsylvania R. R. Co. v. Hughes, 191 U. S. 477, 24 Sup. Ct. 132, 48 L. Ed. 268.

It results from these considerations that the contracts in question must be upheld as lawful and binding, and the plaintiff thereby precluded from recovering herein on the basis sought by him. It is conceded, however, that, under the agreed valuation fixed in the contracts, the plaintiff has suffered a loss in the sum of $1,760.70; and, accordingly, a judgment may be entered in his favor in that sum.